1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  ROBERT STILLWELL, FUTURELINK          CASE NO. 07 CV 607 JM (CAB)
    CORP., SDP ELECTRONICS, INC.,
12  ELECTRONIC MARKETING CORP.,           **ORDER GRANTING IN PART
                                          AND DENYING IN PART
13                          Plaintiffs,   DEFENDANT'S MOTION FOR
                                          SUMMARY JUDGMENT**
          vs.
14                                        Doc. No. 80

15  RADIOSHACK CORPORATION,

16                          Defendant.

17

18          Defendant RadioShack Corporation ("RadioShack") is a national electronics retailer.  Plaintiffs

19  Robert Stillwell ("Stillwell"), Futurelink Corp. ("Futurelink"), SDP Electronics, Inc. ("SDP"), and

20  Electronic Marketing Corp. ("EMC") operate or operated RadioShack franchise stores.   Plaintiffs

21  assert nine claims for relief against RadioShack: (1) breach of contract regarding the Area of Primary

22  Responsibility provision of the parties' franchise agreement; (2) breach of contract regarding  the

23  Temporary Franchise Cost provision of the franchise agreement; (3) breach of contract regarding the

24  Minimum Purchase Requirement provision of the franchise agreement; (4) breach of contract

25  regarding the express covenant of good faith and fair dealing in the franchise agreement; (5)

26  intentional interference with past and prospective economic relations; (6) negligent interference with

27  past and prospective economic relations; (7) violation of the Lanham Act; (8) common law unfair

28  competition based on interference with past and prospective economic relations; and (9) common law

unfair competition based on violation of the Lanham Act.  (Doc. No. 24, Second Amended Complaint, hereinafter "SAC").

RadioShack moves for summary judgment on all nine claims, as well as four affirmative defenses and the unavailability of exemplary damages.  (Doc. No. 80, hereinafter "Mot.").  In their opposition, Plaintiffs seek partial summary judgment under Federal Rule of Civil Procedure 56(d)(1) on Claims 1 through 3, adjudicating that RadioShack breached the franchise agreement.  (Doc. No. 86, hereinafter "Opp.").

The court heard oral argument on September 23, 2009.  (Doc. No. 90).  Following oral argument, the court requested additional briefing from the parties regarding the third claim for relief. (Doc. No. 92).  Both parties provided supplemental briefing.  (Doc. Nos. 95, 100).  For the following reasons, the court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment.  Furthermore, the court GRANTS IN PART Plaintiffs' request for partial summary judgment.

## I.   BACKGROUND

Each plaintiff operates or operated a RadioShack franchise store.  Stillwell's store—until his franchise was cancelled in 2008—was in San Diego County, California.  (Doc. No. 86, Declaration of Robert L. Stillwell, hereinafter "Stillwell Decl.," ¶ 1).  Futurelink's store is in Greenfield, Massachusetts.  (Doc. No. 86, Declaration of Ira Brezinsky, hereinafter "Futurelink Decl.," ¶ 2). SDP's store is in Medina, Ohio.  (Doc. No. 86, Declaration of Paul Sevougian, hereinafter "SDP Decl.," ¶ 1).  EMC's stores are in Williamsburg and Poquoson, Virginia.  (Doc. No. 86, Declaration of Craig Peck, hereinafter "EMC Decl.," ¶¶ 4-6).  Stillwell's franchise dates back to 1981, while the other Plaintiffs' franchises date back before 1979.   (Stillwell Decl. ¶ 1, Futurelink Decl. ¶ 2, SDP Decl. ¶ 1, EMC Decl. ¶ 2).  In 1979, the then-existing franchise agreements between all RadioShack franchisees and RadioShack, which at that time was known as Tandy Corporation, were reformed pursuant to a class action settlement agreement and court order in *HEW Corporation, et al. v. Tandy Corporation*, No. 73-2654-F, 1979 WL 1580 (D. Mass. Jan. 16, 1979).  (SDP Decl. ¶ 7).  Among various new terms, this reformed franchise agreement gave franchisees the right to renew the franchise perpetually unless they violated certain material provisions of the agreement.  (Doc. No. 80,

Declaration of Randy S. Grossman, Ex. A, hereinafter "FA," at 13).  The provisions of Plaintiffs'

individual franchise agreements that are relevant to this litigation, which are partly the result of the

*HEW* litigation, are identical.  (*See* Doc. No. 80, Declaration of Randy S. Grossman, Ex. A, Ex. B, Ex.

C, Ex. D).

Four specific provisions of Plaintiffs' franchise agreement with RadioShack are the primary

subject of the current dispute.  Section 9.1 of the franchise agreement is titled "Area of Primary

Responsibility" ("AOPR").  It states,

> Tandy hereby grants Franchisee the Area of Primary Responsibility ("AOPR")
> described in Schedule A hereto, within which area Tandy will not open a company
> store or authorize the establishment of a franchise store without first giving Franchisee
> an option to open such unit, and within which Tandy will not authorize the
> establishment of an Authorized Sales Center (hereinafter referred to as an "ASC").

(FA at 16).  Section 11.1 of Plaintiffs' franchise agreements is titled "Temporary Franchise Cost."

(FA at 19).  In relevant part, it states,

> Tandy will automatically reduce the price to Franchisee of merchandise (other than
> discontinued merchandise) purchased by Franchisee during the period of an advertised
> sale on such merchandise in Tandy's company-owned retail stores.  Such price
> reductions will commence three weeks prior to such sale and end one week after the
> conclusion of the sale, and the price reductions will be such that the difference between
> the advertised sale price and Franchisee's cost for such merchandise will be equal to
> at least 20% of the sale price.

(FA at 19).  Section 6.2(e) is referred to as the Minimum Purchase Requirement ("MPR") provision.

It provides, in relevant part,

> The failure of Franchisee to make net purchase from Tandy, during Tandy's first full
> fiscal year following approval by the United States District Court for the District of
> Massachusetts of the settlement in a lawsuit entitled *HEW Corp. et al v. Tandy
> Corporation*, C.A. No 73-2654-F, and during each fiscal year thereafter, of
> merchandise having a total cost to Franchisee equal to at least four times Franchisee's
> cost of one of each of the items in the then current year's Annual Radio Shack Catalog,
> provided, however, that the increase in any year's minimum purchase requirement
> (hereinafter referred to as the "MPR") attributable to the introduction by Tandy of new
> categories of products shall not exceed the prior year's MPR by more than 6%.

(FA at13).  Finally, the franchise agreement contains an express covenant of good faith and fair

dealing in Section 12.4.  The covenant states,

> Neither Tandy nor Franchisee shall do or fail to do anything which would deprive the
> other party of the benefits of this Agreement, meaning that both Tandy and Franchisee
> shall be governed by the standards of good faith and fair dealing.

(FA at 21).

The consumer electronics industry has changed considerably in the last 30 years.  As RadioShack and its franchisees have adjusted to industry changes, the relationship between RadioShack and Plaintiffs has soured.  Plaintiffs began complaining about RadioShack's interpretation of some aspects of the franchise agreement beginning in the early 1990s.  (Mot., Ex. H at 312). According to Plaintiffs, however, for many years Plaintiffs tried to "work out problems" with RadioShack because they had a "long-term, continuing relationship."  (Stillwell Decl. ¶ 5).  Plaintiffs claim that their relationship with RadioShack fundamentally changed in recent years highlighted by three events: (1) RadioShack stopped publishing a printed version of an "Annual Radio Shack Catalog," (2) RadioShack increased its sales and marketing through RadioShack.com, and (3) the former head of the Franchise Divison at RadioShack, Len Clegg, departed.  (Opp. at 21).

The actions of RadioShack that give rise to Plaintiffs' contract and tort claims are generally undisputed.  In short, Plaintiffs allege that RadioShack (1) makes direct internet sales to consumers who reside in Plaintiffs' AOPRs, (2) does not give Plaintiffs a 20% margin on merchandise purchased from RadioShack, and (3) changed the manner in which RadioShack calculates the minimum purchase requirement.  These claims and their supporting evidence will be discussed in turn.

## II.   LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must examine the evidence in the light most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  If the moving party, however, "meets its initial burden of identifying for the court the portions of the materials on file that it believe demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment."  *Nilsson , Robbins, Dalgarn, Berlines, Carson & Wurst v. La. Hydrolec*, 854 F.2d 1538, 1542 (9th Cir. 1988) (citing *T.W. Elec. Servs. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987)).

Section 12.10 of the Plaintiffs' franchise agreements requires that "[e]xcept to the extent the law of the jurisdiction where enforcement is sought otherwise requires, this Agreement shall be governed by and interpreted in accordance with the laws of Texas."  (FA at 21).  Accordingly, the

1  court has already ruled that Texas law governs this dispute.  (Doc. No. 13 at 6).

2  **III.   DISCUSSION**

3      RadioShack moves for summary judgment on all nine causes of action, four for breach of

4  contract and five sounding in tort.  RadioShack also moves for summary judgment on four affirmative

5  defenses.   Finally, RadioShack moves for summary judgment regarding the unavailability of

6  exemplary damages.

7      **A.   Contract Claims**

8      "The interpretation of an unambiguous contract is a question of law for the court to decide."

9  *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 129 (Tex. App. 2006).  Whether a contract is

10  ambiguous is also a question of law for the court to decide, by looking at the contract as a whole in

11  light of the circumstances existing at the time the contract was entered into.  *Coker v. Coker*, 650

12  S.W.2d 391, 394 (Tex. 1983).  "An ambiguity does not arise simply because the parties offer

13  conflicting interpretations."  *Id.*  Finally, an ambiguity must appear within the agreement because

14  "[p]arole evidence is not admissible for the purpose of creating an ambiguity."  *Id.*  Therefore, where

15  no material factual dispute exists, summary judgment is appropriate for the contract claims.

16      **1.   Area of Primary Responsibility**

17      Section 9.1 of the franchise agreement—which is the same in each of the Plaintiff's franchise

18  agreements—is titled "Area of Primary Responsibility."  (FA at 16).  In relevant part, Section 9.1

19  states,

20      Tandy hereby grants Franchisee the Area of Primary Responsibility ("AOPR")
    described in Schedule A hereto, within which area Tandy will not open a company
21      store or authorize the establishment of a franchise store without first giving Franchisee
    an option to open such unit, and within which Tandy will not authorize the
22      establishment of an Authorized Sales Center (hereinafter referred to as an "ASC").

23  (FA at 16).  Section 9.1 goes on to describe the procedure whereby RadioShack can open a second

24  retail outlet within a franchisee's AOPR if the franchisee declines the option "to open such unit."  (FA

25  at 16-17).

26      Plaintiffs contend that RadioShack has violated the AOPR provision by "(i) marketing and

27  selling to customers in the AOPR via an internet store, RadioShack.com, without compensating

28  Plaintiffs, (ii) competing against the Plaintiffs in the Plaintiffs' AOPR [*sic*], and (iii) directing

customers in the Plaintiffs' AOPR to RadioShack.com and other RadioShack owned stores." (Opp. at 12). In particular, Plaintiffs argue that RadioShack's website is an "Authorized Sales Center" operating within their AOPRs. (Opp. at 13). RadioShack, in response, argues that the AOPR provision only prohibits RadioShack from opening a second physical (i.e. "brick and mortar") store within the AOPR. (Mot. at 16-17). Neither party disputes that RadioShack has not opened any brick and mortar stores that violate the AOPR provision of Plaintiffs' franchise agreements. Because there is no dispute of any material fact, the court may properly grant summary judgment on this issue. *See* Fed. R. Civ. P. 56(c).

Insofar as Plaintiffs contend that Section 9.1 provides them a broad guarantee of exclusivity within their respective AOPRs, this interpretation of the contract is not supported by its plain language. Section 9.1 only prohibits RadioShack from doing three things within Plaintiffs' respective AOPRs, without first giving Plaintiffs the option of opening a second franchise: (1) opening a "company store;" (2) authorizing the establishment of a "franchise store;" and (3) authorizing the establishment of an "Authorized Sales Center." Section 9.1 does not prohibit RadioShack from "directing customers in the Plaintiffs' AOPR to RadioShack.com and other RadioShack owned stores." (Opp. at 12). Nor does the franchise agreement prohibit RadioShack from "competing against Plaintiffs in [their AOPRs]," other than in the three ways specifically mentioned in Section 9.1. (Opp. at 12).

Clearly, on its face, Section 9.1 does not prohibit internet sales by RadioShack. There is simply no ambiguity in the provision on this point. Moreover, the parties do not evince any intent in Section 9.1 to support Plaintiffs' contention. The absence of any such intent is important because, "[i]n construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The franchise agreement was written and entered into in 1979. At that time, the plain language of Section 9.1 demonstrates that the parties intended to provide some protection to franchisees from direct competition from other RadioShack stores. The parties could not have intended to protect franchisees from internet sales because, in 1979, the internet did not exist in any

1    form that allowed commercial transactions.[1]

2        Moreover, in 1979, RadioShack made direct catalog sales via mail order and telephone. (*See*

3    Doc. No. 89, Declaration of Paul Rickels, Ex. A).  The franchise agreement does not prohibit these

4    sales in any fashion, further evidencing that Section 9.1 was not intended to prevent RadioShack's

5    direct sales that did not originate in a brick and mortar store.  Therefore, the terms "company store,"

6    "franchise store," and "Authorized Sales Center"—in light of the circumstances existing at the time

7    the contract was entered into—could not have encompassed RadioShack's online sales through its

8    website.  *See Coker*, 650 S.W.2d at 394.

9        Because RadioShack's website is not an "Authorized Sales Center" within the meaning of

10    Section 9.1, RadioShack does not breach the franchise agreement by making direct internet sales to

11    customer who reside in Plaintiffs' AOPRs.  Therefore, RadioShack's motion for summary judgment

12    regarding the AOPR provision (Claim 1) is granted.

### 2.    Temporary Franchise Cost

14        Section 11.1 of Plaintiffs' franchise agreements is titled "Temporary Franchise Cost."  (FA at

15    19).  In relevant part, it states,

> Tandy will automatically reduce the price to Franchisee of merchandise (other than
> discontinued merchandise) purchased by Franchisee during the period of an advertised
> sale on such merchandise in Tandy's company-owned retail stores.  Such price
> reductions will commence three weeks prior to such sale and end one week after the
> conclusion of the sale, and the price reductions will be such that the difference between
> the advertised sale price and Franchisee's cost for such merchandise will be equal to
> at least 20% of the sale price.

20    (FA at 19).  Plaintiffs contend that RadioShack has breached this provision by: (1) excluding vendor-

21    branded products from the 20% price reduction, (2) failing to apply the 20% reduction on some

22    RadioShack-branded merchandise, (3) excluding "unadvertised special" from the 20% price reduction,

23    and (4) failing to *automatically* provide the price reduction.  (Opp. at 11-12).

24        In moving for summary judgment, RadioShack argues against a position that Plaintiff's no

25    longer hold.  RadioShack seems to think that Plaintiffs believe the Temporary Franchise Cost

26    provision guarantees franchisees a 20% margin on all products purchased from RadioShack and resold

---

28       [1] The court finds it appropriate to take judicial notice of the fact that the modern internet did not exist in 1979.  *See* Fed. R. Evid. 201.

by franchisees. While there are some indications that Plaintiffs once made this argument, both parties and the court now agree that the Temporary Franchise Cost provision does not guarantee franchisees a 20% margin on all items purchased from RadioShack.

Despite the parties' disagreements about some of the key terms, the Temporary Franchise Cost provision of the franchise agreement is not ambiguous. *See Coker*, 650 S.W.2d at 394 ("An ambiguity does not arise simply because the parties offer conflicting interpretations."). Nonetheless, the court must interpret three key terms—"merchandise," "advertised sale," and "company-owned retail stores"—to resolve the dispute.

First, "merchandise" refers to all merchandise sold by RadioShack. The Temporary Franchise Cost provision draws no distinction between vendor-branded merchandise and any other type of merchandise. Indeed, neither the term nor the concept of "vendor-branded merchandise" appears anywhere in the franchise agreement. Therefore, RadioShack must automatically discount prices on all merchandise—whether it is "vendor-branded," "RadioShack-branded," or otherwise—purchased by franchisees that is included in an advertised sale during the established time period.

Second, an "advertised sale" refers to the temporary price reduction of merchandise for an established time period that is publicized to the general public. It is of no moment how the temporary price reduction is publicized. Print, television, radio, internet, and any other advertisements that are intended to draw customers into RadioShack stores all trigger the Temporary Franchise Cost provision. Merely labeling merchandise offered at a reduced price an "unadvertised special" does not relieve RadioShack of its obligations under the Temporary Franchise Cost provision, if that merchandise is otherwise part of an advertised sale.

Third, "company-owned retail stores" refers to brick and mortar retail stores only. As discussed above, internet sales were not contemplated by the parties when they entered the franchise agreement. Moreover, internet sales are fundamentally different than sales in brick and mortar stores. Internet retailers have different business structures and costs which oftentimes allow them to sell merchandise at lower prices than brick and mortar stores. *See generally* Chris Anderson, *The Long Tail* (2006). Therefore, the Temporary Franchise Cost provision is only triggered when RadioShack offers temporary price reductions on merchandise at its brick and mortar "company-owned retail

1   stores." Franchisees do not get a 20% margin on internet-only pricing.

2   By interpreting the Temporary Franchise Cost provision in this way, the court supports the

3   "true intentions of the parties as expressed in the instrument." *J.M. Davidson*, 128 S.W.3d at 229.

4   The franchise agreement demonstrates a desire to offer some protection to franchisees from

5   RadioShack underselling them at nearby company-owned retail stores. Sale advertising creates

6   expectancies in the public that RadioShack stores will honor the prices in those advertisements. The

7   public will not draw a distinction between franchised and company-owned RadioShack stores, so

8   franchisees will be expected to honor the advertised prices as well. The Temporary Franchise Cost

9   provision protects franchisees by ensuring a profitable margin on the merchandise that the public

10  reasonably expects to be discounted. However, the public's expectations about internet pricing are

11  oftentimes different than its expectations about brick and mortar store pricing. *See generally* Chris

12  Anderson, *The Long Tail* (2006). Therefore the Temporary Franchise Cost provision need not extend

13  to internet-only pricing.

14  Finally, Plaintiffs provide evidence that RadioShack has breached the Temporary Franchise

15  Cost provision by failing to automatically provide the 20% margin on both vendor- and RadioShack-

16  branded merchandise during advertised sale periods. For example, Plaintiffs provide a document titled

17  "RadioShack Franchise Event 16-FLY060108 Line up" which purportedly lists the sale items

18  available during a two-week advertised sale from June 1, 2008 to June 14, 2008. (SDP Decl. at 15,

19  Ex. 16). The merchandise list shows many items, both vendor- and RadioShack-branded, that do not

20  offer franchisees a 20% margin. Plaintiffs also provide another list of sale items on which they did

21  not automatically receive the 20% margin in April and May of 2007. (Futurelink Decl. at 17, Ex. 9).

22

23  For the foregoing reasons, RadioShack's motion for summary judgment regarding the

24  Temporary Franchise cost provision claim (Claim 2) is denied, and Plaintiffs' motion for partial

25  summary judgment under Federal Rule of Civil Procedure 56(d)(1) is granted. Plaintiffs may prove

26  at trial damages arising from RadioShack's breaches of the Temporary Franchise Cost provision.

27  **3.      Minimum Purchase Requirement**

28  From at least 1979 until 2002, RadioShack printed an "Annual Radio Shack Catalog" for

07cv607

distribution to stores and customers.  (Doc. No. 100, Declaration of Jeffrey L. Fillerup, hereinafter

"Fillerup Decl.," Ex. 14).  In 2003, RadioShack discontinued a paper catalog in favor of the product

listing on RadioShack.com.  (Fillerup Decl., Ex. 14).  In 2004, RadioShack began using the products

listed on its website to calculate the minimum purchase requirement for franchisees as required by

Section 6.2(e) of the franchise agreement.  (Fillerup Decl., Ex. 15).  Section 6.2(e) states, in relevant

part,

> The failure of Franchisee to make net purchase from Tandy, during Tandy's first full
> fiscal year following approval by the United States District Court for the District of
> Massachusetts of the settlement in a lawsuit entitled *HEW Corp. et al v. Tandy
> Corporation*, C.A. No 73-2654-F, and during each fiscal year thereafter, of
> merchandise having a total cost to Franchisee equal to at least four times Franchisee's
> cost of one of each of the items in the then current year's Annual Radio Shack Catalog,
> provided, however, that the increase in any year's minimum purchase requirement
> (hereinafter referred to as the "MPR") attributable to the introduction by Tandy of new
> categories of products shall not exceed the prior year's MPR by more than 6%.

(FA at13).  Plaintiffs allege RadioShack breached this provision by calculating the MPR using

anything other than a printed "Annual Catalog."

To begin with, the court must interpret the phrase "Annual Radio Shack Catalog" as it is used

in Section 6.2(e).  In interpreting a contract, the court should express the "true intentions of the parties

as expressed in the instrument."  *J.M. Davidson*, 128 S.W.3d at 229.  Although the parties disagree

about its meaning, "Annual Radio Shack Catalog" is not ambiguous.  *See Coker*, 650 S.W.2d at 394.

"Annual Radio Shack Catalog" simply means a full listing of the products sold by RadioShack in a

given year.

As RadioShack correctly points out, "Annual Radio Shack Catalog" has meaning independent

of Section 6.2(e) of the franchise agreement.  "Annual Radio Shack Catalog" is not elsewhere defined

in the franchise agreement, but the reference in the MPR provision indicates that the phrase has

independent meaning.  Not only is "Annual Radio Shack Catalog" capitalized as if it is the title of a

publication, Section 6.2(e) references it as "*the then current year's* Annual Radio Shack Catalog."

The use of a definite article, rather than an indefinite article, as well as the "current year" reference,

to describe the "Annual Radio Shack Catalog" is evidence of its prior, independent existence.

Because "Annual Radio Shack Catalog" has meaning independent of the franchise agreement,

RadioShack has significant discretion, using its business judgment, to determine both the contents and

07cv607

the form of the "Annual Radio Shack Catalog." Therefore, RadioShack does not breach the franchise agreement merely by ending publication of a printed version of the "Annual Radio Shack Catalog" and instead using a listing of the products on RadioShack.com.

Nonetheless, Section 6.2(e) of the franchise agreement imposes some restrictions on the content of the "Annual Radio Shack Catalog" for purposes of calculating the MPR. First, the "Annual Radio Shack Catalog," no matter how it is published, must include the franchisee's cost for each of the products listed. A product list which only includes the retail prices charged to direct consumers cannot be used to calculate the value of "merchandise having a total cost to Franchisee equal to at least four times Franchisee's cost of one of each of the items in the then current year's Annual Radio Shack Catalog," because this calculation calls for the "Franchisee's cost."

Second, any products contained in the "Annual Radio Shack Catalog" used to calculate the MPR must be available for purchase by franchisees. If RadioShack sells products on its website directly to consumers, but does not also sell those products wholesale to its franchisees, then those products cannot be included in the "Annual Radio Shack Catalog" for purposes of calculating the MPR. This requirement flows naturally from Section 6.2(e)'s method for calculating the MPR. If a product is not available for wholesale purchase, then it won't have a "Franchisee's cost" as required by Section 6.2(e).

Third, the listing of products deemed to be the "Annual Radio Shack Catalog" for purposes of calculating the MPR must be disclosed to franchisees. Section 6.2(e) provides a method for calculating the MPR that gives franchisees a fair opportunity to plan their purchases from RadioShack, and their corresponding efforts to resell that merchandise, in a given year. By calculating the MPR at the beginning of a fiscal year, based upon a known listing of products with their corresponding prices called the "Annual Radio Shack Catalog," Section 6.2(e) ensures that franchisees have the information they need to plan their business efforts for the year so that franchisees can both meet the MPR requirement and run a profitable business. Without a transparent process for calculating the MPR, this planning becomes much more difficult.

Finally, Section 6.2(e) requires that the catalog RadioShack uses to calculate the MPR be an "Annual" catalog. Therefore, the "Annual Radio Shack Catalog" can only contain products that

RadioShack believes in good faith will be available for purchase by franchisees throughout the entire fiscal year.  This interpretation is apparent from the structure of Section 6.2(e), which gives franchisees a fiscal year in which to purchase—and ostensibly resell—merchandise satisfying the MPR.  Moreover, the nature of an "annual" catalog requires that RadioShack, absent extraordinary circumstances,  honor the franchisee's cost published in the "Annual Radio Shack Catalog" for the entire year.  This give franchisees the fair opportunity to plan their purchases and sales efforts that Section 6.2(e) contemplates.

There is a dispute of material fact regarding whether RadioShack has violated Section 6.2(e) of the franchise agreement.  Plaintiffs provide evidence that they never received, even in response to discovery requests, any product list that was used to calculate the MPR since 2004.  In its motion for summary judgment, RadioShack argues that Plaintiffs cannot prove that any purported breach of the MPR provision actually caused Plaintiffs' damages.  According to RadioShack, "[t]o prevail on their MPR claims, Plaintiffs must first prove what the MPR amount should have been.  Then, Plaintiffs must prove that they suffered some damages that would not have occurred *but for* the difference between the actual MPR amount and the 'correct' amount."  While RadioShack is generally correct about this, the reason that Plaintiffs cannot meet this burden is because RadioShack has not provided to Plaintiffs, in contravention of both the duty imposed by Section 6.2(e) and RadioShack's discovery obligations, the information Plaintiffs need to calculate what the "correct" MPR amount should have been.  As this factual information is disputed, RadioShack motion for summary judgment on Plaintiff's breach of contract claim regarding the MPR provision (Claim 3) is denied.

### 4.    Covenant of Good Faith and Fair Dealing

Texas law does not imply a covenant of good faith and fair dealing in every contract or business transaction.  *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 295 (Tex. App. 1997).  Rather, the implied covenant of good faith and fair dealing only arises when there is a "special relationship" between the parties.  *Id.*  A franchisor-franchisee relationship is not a "special relationship" under Texas law.  *Id.*  Absent a special relationship, "the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort."  *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 481 (Tex. App. 1989).   Therefore, because Plaintiffs and

RadioShack do not have a "special relationship," Plaintiffs claim for breach of the covenant of good faith and fair dealing can only be based upon the terms of the franchise agreement.

Section 12.12 of the franchise agreement states,

Neither Tandy nor Franchisee shall do or fail to do anything which would deprive the other party of the benefits of this Agreement, meaning that both Tandy and Franchisee shall be governed by the standards of good faith and fair dealing.

(FA at 21). The parties are thus governed by the duty of good faith and fair dealing, but only insofar as it "is aimed at making effective the agreement's promises." *Adolph Coors*, 780 S.W.2d at 482. The duty of good faith and fair dealing "defines other duties which grow out of specific contract terms and obligations," but it does not give the parties or the court leave to add new terms to the contract. *Id.*; *see also Massey v. Tandy*, 987 F.2d 1307, 1309 (8th Cir. 1993). Therefore, if the express terms of the contract govern a party's behavior, the court will not analyze that behavior for a breach of the covenant of good faith and fair dealing. *See, e.g., Adolph Coors*, 780 S.W.2d at 482-83. Rather, the covenant of good faith and fair dealing is only meant to protect against behavior that is not governed by the contract but significantly deprives a party of the benefits of the contract.

Plaintiffs list numerous ways in which RadioShack allegedly acted in bad faith: (1) "competing against the Plaintiffs by marketing and selling to customers in Plaintiffs' AOPR [*sic*];" (2) "directly selling to customers in Plaintiffs' AOPR [*sic*];" (3) "selling products to Plaintiffs' customers at lower prices than the prices charged to Plaintiffs;" (4) "using unadvertised specials to force Plaintiffs to sell products at lower prices after the Plaintiffs had paid a higher price to RadioShack for the item;" (5) advertising to the public that Plaintiffs' store [*sic*] would provide customer service, support, exchanges, returns and warranty services if the customers bought from Radioshack.com;" (6) "using Plaintiffs [*sic*] customer names and addresses to market directly to Plaintiffs [*sic*] customers;" (7) "changing the mix of products Plaintiffs were required to buy to satisfy their MPR [*sic*] to low margin products and/or products that RadioShack claimed would not be covered by the 20% guarantee;" (8) "declining to credit the Plaintiffs for pricing set forth on RadioShack.com;" (9) "forcing Plaintiffs to sell products at lower prices and fixing Plaintiffs' prices by advertising on RadioShack.com;" (10) "expanding promotional items RadioShack advertises on RadioShack.com as 'unadvertised' at prices Plaintiffs cannot compete with;" (11) "setting an MPR that allows RadioShack to fix prices to

Plaintiffs on items that Plaintiffs can buy at lower prices from other vendors;" and (12) "unilaterally applying a separate MPR to each store location when there should only be one MPR in Plaintiffs' AOPR [*sic*]."  (Opp. at 18-19).

Much of this behavior is expressly governed by the terms of the contract and therefore cannot be the basis of Plaintiffs' bad faith claim.  *See Adolph Coors*, 780 S.W.2d at 482-83.  Plaintiffs contend that "competing against the Plaintiffs by marketing and selling to customers in Plaintiffs' AOPR [*sic*]," "directly selling to customers in Plaintiffs' AOPR [*sic*]," and  "forcing Plaintiffs to sell products at lower prices and fixing Plaintiffs' prices by advertising on RadioShack.com" violate both the Area of Primary Responsibility provision of the franchise agreement as well as the covenant of good faith and fair dealing.  Plaintiffs' contentions that RadioShack is "changing the mix of products Plaintiffs were required to buy to satisfy their MPR [*sic*] to low margin products and/or products that RadioShack claimed would not be covered by the 20% guarantee," "setting an MPR that allows RadioShack to fix prices to Plaintiffs on items that Plaintiffs can buy at lower prices from other vendors," and  "unilaterally applying a separate MPR to each store location when there should only be one MPR in Plaintiffs' AOPR [*sic*]" are strikingly similar to the ways in which Plaintiffs contend that RadioShack breached the Minimum Purchase Requirement provision of the franchise agreement.  "[U]sing unadvertised specials to force Plaintiffs to sell products at lower prices after the Plaintiffs had paid a higher price to RadioShack for the time," "declining to credit the Plaintiffs for pricing set forth on RadioShack.com," and "expanding promotional items RadioShack advertises on RadioShack.com as 'unadvertised' at prices Plaintiffs cannot compete with" are the same behaviors that Plaintiffs allege violate the Temporary Franchise Cost provision.  Finally, whether RadioShack can use Plaintiffs' "customer names and addresses to market directly to Plaintiffs [*sic*] customers" is expressly allowed by Section 5 of the franchise agreement.  (*See* FA at 10-12).  Therefore, none of these allegations amount to a breach of the covenant of good faith and fair dealing.

Nonetheless, Plaintiffs' shotgun approach to pleading a violation of the express covenant of good faith and fair dealing has delivered two possible hits.  First, Plaintiffs provide evidence that RadioShack offers merchandise for sale directly to consumers on RadioShack.com at retail prices lower than the wholesale prices offered to franchisees.  (*See* Futurelink Decl. ¶ 57, Ex. 16, Ex. 17).

No provision of the franchise agreement either allows or prohibits any such behavior, outside of the particular time periods described in the Temporary Franchise Cost provision. (*See* FA). Yet any such activity by RadioShack could be depriving franchisees of the benefits of the franchise agreement. The essence of the franchise relationship, as expressed in the franchise agreement, is that franchisees will buy merchandise from RadioShack, and then resell that merchandise at a profit. While the franchise agreement does not guarantee any particular profit margin, RadioShack undercuts the basic structure of the franchise relationship by giving preferential pricing to consumers. Whether such preferential pricing has occurred and, if it has, whether it violates the express covenant of good faith and fair dealing are questions for the jury.

Second, Plaintiffs provide evidence that RadioShack informs online consumers that merchandise purchased from RadioShack.com may be returned to Plaintiffs' franchise stores. (*See* SDP Decl., Ex. 19). The franchise agreement does not require franchisees to accept the return of merchandise purchased from any other RadioShack entity. (*See* FA). Indeed, no provision of the franchise agreement specifically addresses this issue. (*See* FA). Requiring franchisees to accept the return of merchandise purchased on RadioShack.com, however, may deprive the franchisees of the benefits of the franchise agreement. The extent to which franchisees are reimbursed for accepting returns is unclear. If franchisees are not fully reimbursed for accepting returns—including the money refunded as well as overhead costs—then RadioShack receives a benefit from the relationship the franchise agreement creates that RadioShack has not bargained for, a benefit that could diminish the profits of franchisees. If, on the other hand, franchisees refuse to accept the return of merchandise purchased on RadioShack.com because the franchise agreement does not require it, then franchisees risk the loss of goodwill with consumers. In both instances, franchisees stand to lose a benefit of the franchise agreement: either money it has no obligation to spend or some of the goodwill associated with the RadioShack brand.

The court finds that a dispute of material fact exists regarding whether RadioShack has breached the express covenant of good faith and fair dealing in the two manners described. Therefore, RadioShacks motion for summary judgment on Plaintiff's breach of contract claim regarding the express covenant of good faith and fair dealing (Claim 4) is denied.

**B.    Tort Claims**

      **1.    Intentional and Negligent Interference with Past and Prospective Economic Relations**

RadioShack moves for summary judgment on Plaintiffs' claims for both intentional and negligent interference with past and prospective economic relations.  Plaintiffs contend that RadioShack has interfered with Plaintiffs' existing and potential customers through direct sales and marketing within Plaintiffs' AOPRs via RadioShack.com.  (SAC ¶¶ 72-84).

"To establish a claim of tortious interference with a prospective business relationship, a plaintiff must establish: (1) a reasonable probability that the plaintiff would have entered into the business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Labor v. Warren*, 268 S.W.3d 273, 278 (Tex. App. 2008) (citing *Baty v. Protech Insurance Agency*, 63 S.W.2d 841, 860 (Tex. App. 2001)).  Interference does not include "the bona fide exercise of one's own rights in a transaction."  *Barker v. Brown*, 772 S.W.2d 507, 512 (Tex. App. 1989).

RadioShack is entitled to summary judgment for three reasons.  First, Plaintiffs have provided no evidence of the first element: a reasonable probability that they would have entered into a business relationship.  Plaintiffs merely make conclusory assertions such as "RadioShack . . . has sold directly to [Plaintiffs'] customers" and "RadioShack began to heavily promote, market and sell to [Plaintiffs'] customers . . . through its online store."  (EMC Decl. ¶ 55; Stillwell Decl. ¶ 31).

Plaintiff Stillwell further alleges that he lost two large customers—the Ramona School District and the California Department of Forestry—who instead purchased directly from RadioShack's website.  (Stillwell Decl. ¶ 45).  But even this does not show a "reasonable probability" that these customers would have continued to buy from Stillwell but for an independently tortious or unlawful act by RadioShack.  *Cf. Gonzalez v. San Jacinto Methodist Hosp.*, 905 S.W.2d 416, 421 (Tex. App. 1995).  In *Gonzalez*, the plaintiff was excluded from practicing at a hospital.  *Id.*  Finding that numerous doctors submitted letters seeking to have the plaintiff performance anesthesiology services,

the court determined that there was evidence that plaintiff would have performed those services but for his exclusion.  *Id.*  Stillwell's testimony that he lost clients to RadioShack's website—which is either based on hearsay or speculation—does not provide comparable evidence of a reasonable probability of a future business relationship.

Second, Plaintiffs have provided no evidence of an "independently tortious or unlawful act" by RadioShack that prevented the relationship from occurring.  *Labor*, 268 S.W.2d at 278.  Plaintiffs argue that RadioShack interfered with their business relations by marketing and selling to customers within their AOPRs.  But even if this were a breach of the franchise agreement—and the court finds that it is not—it would nonetheless still fall short of an "independently tortious or unlawful act."  *See Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (holding that breach of contract is not tortious).  Indeed, because the court also grants RadioShack's motion for summary judgment regarding Plaintiffs' Lanham Act claim, *see infra*, Plaintiffs cannot point to any "independently tortious act" committed by RadioShack.  *Labor*, 268 S.W.3d at 278.

Third, Plaintiffs' evidence is consistent with RadioShack's bona fide exercise of its own rights in a transaction.  *See Barker*, 772 S.W.2d at 512.  As has already been discussed, RadioShack is within its rights under the franchise agreement to make direct online sales to customers living within Plaintiffs' AOPRs.  Because RadioShack had the bona fide right to make those sales, that conduct cannot be "interference."  *See id.*

Plaintiff's have not carried their burden to provide sufficient evidence on each element of the interference with past and prospective economic relations claims.  Therefore, RadioShack's motion for summary judgment on Claims 5 and 6 is granted.

### 2.     Lanham Act

Plaintiffs argue that RadioShack violated section 43(a) of the Lanham Act by providing "misleading and confusing information . . . about the relationship between RadioShack.com and the Plaintiffs."  (Opp. at 24).  In particular, Plaintiffs claim that RadioShack "gives consumers false information that RadioShack.com and Plaintiffs are the same entity."  (Opp. at 24).

Plaintiffs specifically rely on section 43(a)(1)(A) of the Lanham Act, which provides that,

(1) Any person who, on or in connection with any goods or services, or any

- 17 -

container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of facts, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  To meet its burden at the summary judgment stage, Plaintiffs must therefore present admissible evidence of (1) a false or misleading description or representation of fact that is (2) likely to cause confusion, mistake, or deception about (3) the affiliation, connection, or association of Plaintiffs with RadioShack.com, and (4) damages.

Although they present no statements by RadioShack that "RadioShack.com and Plaintiffs are the same entity," Plaintiffs provide some evidence of a misleading representation of facts to meet the first element of their Lanham Act claim.  RadioShack's website informs customers that products can be returned to any RadioShack store, including those of Plaintiffs.  (SDP Decl., Ex. 19).  However, Plaintiffs' franchise agreement with RadioShack does not require franchisees to accept returns of items sold on RadioShack.com.  (*See* FA).

Moreover, the information RadioShack provides about returns relates to the affiliation, connection, or association of Plaintiffs and RadioShack.com.  Therefore, there is some evidence to meet the third element of Plaintiff's Lanham Act claim.  Likewise, it is not hard to foresee damages, the fourth element of their claim.  Plaintiffs are put in the difficult position of accepting returns, for which they are only partially compensated, or refusing returns and losing goodwill with customers.  (Stillwell Decl. ¶ 41).

But Plaintiffs do not provide any admissible evidence on the second element of their claim: that RadioShack's return information—the only admissible statement that meets the first element—is "likely to cause confusion, or to cause mistake, or to deceive" consumers. 15 U.S.C. § 1125(a)(1)(A).  Plaintiffs merely state in declarations that they "have been told numerous times that [consumers] thought their purchases on RadioShack.com were credited to [plaintiffs]." (Stillwell Decl. ¶ 41).  This hearsay statement, and others like it, do not meet Plaintiffs' burden of producing admissible evidence

that creates a dispute of material fact regarding the likelihood of confusion.

Because Plaintiffs have not met their burden, the court grants RadioShack's motion for summary judgment on Plaintiff's Lanham Act claim (Claim 7).

### 3.     Unfair Competition

"The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 367-68 (5th Cir. 2000) (citing *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)).  To maintain an unfair competition claim, a plaintiff must prove an independent substantive tort or other illegal conduct by the defendant.  *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904 (Tex. App. 1989).  A mere breach of contract does not qualify as an "independently tortious or unlawful act."  *See Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

As the court grants RadioShack's motion for summary judgment on each of Plaintiffs' tort claims, Plaintiffs' unfair competition claims must fail as well.  Therefore, the court grants RadioShack's motion for summary judgment on Claims 8 and 9.

### C.     Affirmative Defenses

RadioShack raises four affirmative defenses to all of Plaintiff's claims: (1) the statute of limitations; (2) waiver; (3) ratification; and (4) laches.

### 1.     Statute of Limitations

RadioShack contends that all of Plaintiffs' claims are barred by the respective statutes of limitations.  Under Texas law, the statute of limitations for a contract claim is four years.  Tex. Civ. Prac. & Rem. § 16.051; *Continental Cas. Co. v. Dr. Pepper Bottling Co. of Texas*, 416 F. Supp. 2d 497, 506 (N.D. Tex. 2006).  The statute of limitations on tort claims is two years.  Tex. Civ. Prac. & Rem. § 16.003.  "Absent special circumstances, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury or the extent of actual damages is not discovered until later." *Continental Cas. Co.*, 416 F. Supp. 2d at 506 (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)).  On summary judgment, the defendant has the burden of showing that there is no issue of material fact regarding the statute of limitations and that the defendant is entitled to judgment as a matter of law.

*Continental Cas. Co.*, 416 F. Supp. 2d at 505-06.

Plaintiffs contend that RadioShack has systematically and continually breached the franchise agreement. It is unclear from the record when the first alleged breach occurred, but there is evidence that the parties disputed some of the franchise agreement terms as far back as the early 1990s. Regardless of when Plaintiffs first took exception to RadioShack's interpretation of the franchise agreement, RadioShack's interpretation has survived to the present action. Therefore, any breach of contract by RadioShack has continued to the present day. *See Dvorken v. Lone Star Industries, Inc.*, 740 S.W.2d 565, 567 (Tex. App. 1987). Each time RadioShack may have failed to meet its obligations under the franchise agreement, RadioShack created a new, divisible breach of the contract. *See Republic Parking System of Texas v. Medical Towers, Ltd.*, No. 14-02-01141-CV, 2004 WL 2358315 (Tex. App. Oct. 21, 2004). Therefore, Plaintiffs may recover for any breaches by RadioShack dating back four years from the filing of the complaint.[2] *See Dvorken*, 740 S.W.2d at 567. As the complaint was filed on April 3, 2007, Plaintiffs can recover on any breaches of the franchise agreement since April 3, 2003. Therefore, RadioShack's motion for summary judgment is granted in part (for claims arising prior to April 3, 2003) and denied in part (for claims arising after April 3, 2003).

### 2.      Waiver, Ratification, and Laches

RadioShack contends that all of Plaintiffs' claims are barred by the affirmative defenses of waiver, ratification, and laches. "Waiver is an intentional relinquishment of a known right." *Barrand, Inc. v. Whataburger*, 214 S.W.2d 122, 144 (Tex. App. 2006). "Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise affirmatively acknowledging it." *Id.* at 146. For laches to apply, RadioShack must show that (1) Plaintiffs unreasonably delayed their claims, (2) RadioShack detrimentally changed its position in good faith because of the delay, and (3) there are extraordinary circumstances that would make it inequitable for Plaintiffs' claims to continue.

---

[2] Both parties discuss at length the "continuing contract" exception to the statute of limitations. The court finds that this exception does not apply. *See Dvorken v. Lone Star Industries, Inc.*, 740 S.W.2d 565, 567 (Tex. App. 1987); *Republic Parking System of Texas v. Medical Towers, Ltd.*, No. 14-02-01141-CV, 2004 WL 2358315 (Tex. App. Oct. 21, 2004).

Section 12.4 of the franchise agreement provides that,

> No failure, refusal, or neglect of Tandy or Franchisee to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder or with any specification, standard or operating procedure will constitute a waiver of any provision of this Agreement or any specification, standard or operating procedure.

(FA at 20). This provision alone defeats RadioShack's motion for summary judgment on the affirmative defenses of waiver and ratification. The parties agreed in Section 12.4 of the franchise agreement that contract claims cannot be waived by any action or inaction of the parties. As RadioShack provides no evidence of waiver or ratification other than Plaintiff's prior failure to exercise their rights under the contract, there is no basis for RadioShack's asserted affirmative defenses that can overcome the agreement of the parties expressed in Section 12.4. Therefore, RadioShack's motion for summary judgment on the affirmative defenses of waiver and ratification is denied.

Regarding laches, RadioShack fails to carry its burden to show the absence of any dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56. RadioShack has not even asserted—much less provided undisputed, admissible evidence—that it has detrimentally changed its position based upon Plaintiff's alleged delay in bringing this case. Indeed, it is apparent from RadioShack's briefing that RadioShack has interpreted its obligations under the franchise agreement consistently since at least the 1990s. (*See* Opp. at 8-9). Therefore, RadioShack has not shown that it has detrimentally changed its position, and its motion for summary judgment on the affirmative defense of laches is denied.

**D.      Exemplary Damages**

RadioShack moves for summary judgment on Plaintiff's request for exemplary damages. In Texas, "[e]xemplary damages are recoverable only upon a finding of an independent tort with accompanying actual damages. A breach of contract alone will not support exemplary damages." *Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 352 (Tex. App. 2004) (citing *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995)) (internal citations omitted). As the court grants RadioShack's motion for summary judgment on all of Plaintiffs' tort claims, Plaintiff's cannot recover exemplary damages as a matter of law. Therefore, RadioShack's motion for summary judgment

regarding exemplary damages is granted.

## IV.    CONCLUSION

For the foregoing reasons, Defendant RadioShack's motion for summary judgment is GRANTED as to claim 1 (breach of contract regarding area of primary responsibility provision), claim 5 (intentional interference with past and prospective economic relations), claim 6 (negligent interference with past and prospective economic relations), claim 7 (violation of the Lanham Act), claim 8 (unfair competition based on interference with past and prospective economic relations), and claim 9 (unfair competition based on violation of the Lanham Act).   RadioShack's motion for summary judgment is DENIED regarding claim 2 (breach of contract regarding temporary franchise cost), claim 3 (breach of contract regarding minimum purchase requirement), and claim 4 (breach of good faith and fair dealing).   RadioShack's motion for summary judgment on its affirmative defense of the statute of limitations is GRANTED as to claims arising before April 3, 2003 and DENIED as to claims arising after April 3, 2003.   RadioShack's motion for summary judgment on its affirmative defenses of waiver, laches, and ratification is DENIED as to claims otherwise surviving.   Finally, RadioShack's motion for summary judgment on the unavailability of exemplary damages is GRANTED.

Plaintiffs' motion for summary judgment under Federal Rule of Civil Procedure 56(d)(1) is GRANTED regarding claim 2 (breach of contract regarding temporary franchise cost).   Plaintiffs' motion for summary judgment under Federal Rule of Civil Procedure 56(d)(1) on all other claims is DENIED.

**IT IS SO ORDERED.**

DATED:  November 2, 2009

_____
Hon. Jeffrey T. Miller
United States District Judge

07cv607